# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 19-10896-GW-GJSx | Date | March 9, 2020 |
|---|---|---|---|
| Title | *Jennifer Herrington v. The Nature Conservancy, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Molly Durkin | Alicia C. Anderson |
| Marqui Hood | Andrea Chavez |

**PROCEEDINGS:** PLAINTIFF JENNIFER HERRINGTON'S MOTION FOR REMAND [11]

Court hears oral argument. The tentative circulated and attached hereto, is adopted as the Court's final ruling. The Court GRANTS Plaintiff's Motion to Remand.

: 10

Initials of Preparer JG

<u>*Jennifer Herrington v. The Nature Conservancy et al.*</u>; Case No. 2:19-cv-10896-GW-(GJSx)
Tentative Ruling on Motion to Remand

### I.     Background

Plaintiff Jennifer Herrington sues Defendants The Nature Conservancy ("TNC"), The Nature Conservancy of California ("TNC CA"), and Does 1-50, inclusive, for: (1) retaliation, in violation of Cal. Labor Code § 1102.5; (2) sex discrimination, in violation of Cal. Gov. Code § 12940; (3) failure to prevent discrimination; and (4) wrongful termination in violation of public policy. *See generally* Complaint, Docket No. 1-1.

Plaintiff alleges the following: Plaintiff is a former employee of Defendant. *Id.* ¶ 1. She was hired as a Conservation Assistant by TNC's Colorado Chapter in 2000. *Id.* ¶ 10. Plaintiff was promoted several times, was considered a leader in stewardship, and was asked to join a variety of task forces to shape how stewardship is executed across the organization. *Id.* ¶ 11. In 2018, Plaintiff was offered the role of Project Manager for TNC CA's Dangermond Preserve (the "Preserve"). *Id.* ¶ 12. Plaintiff agreed to relocate her family from Colorado to California for the opportunity. *Id.* Before TNC acquired the Preserve, it had been mismanaged. *Id.* ¶ 13.

Plaintiff assumed her role as Preserve Property Manager in June 2018. *Id.* ¶ 14. She was one of only two women employees who lived on the property, and all of her superiors were men. *Id.* She observed people assuming traditional gender roles on the Preserve's ranches. *Id.* At one point, while Plaintiff was speaking to cattle ranch manager Justin Cota about her plans for coordination with neighboring ranches, he told her "why don't you go into the house and talk with my wife." *Id.* ¶ 15. Cota had previously handled coordinating with neighboring ranches for the prior preserve owner. *Id.* Cota repeatedly ignored Plaintiff's leadership role and made decisions without consulting or involving her in matters on which she was supposed to lead. *Id.*

Similarly, Preserve Director Michael Bell was dismissive of Plaintiff's ideas, frequently disregarding her experience in stewardship by second-guessing or ignoring her decisions and recommendations. *Id.* ¶ 16. Bell rarely spoke directly to Plaintiff if he was not happy with something she did; instead, he spoke to her male supervisor, Project Director Ethan Inlander, expecting that Plaintiff would get the message. *Id.* Plaintiff was left out of planning discussions that Bell had with Inlander and Inlander's supervisor, Associate Director of Conservation Investments Mike McFadden. *Id.* One incident occurred when Plaintiff attempted to address

1

hunting on the Preserve. *Id.* ¶ 17. Bell was allowing his supervisor, TNC's California State Director Mike Sweeney, to hunt on the Preserve without restriction. *Id.* Normally, TNC required a "compatible human use" justification form to be completed for hunting, with applicable ecological information to justify the activity, prior to any hunting occurring. *Id.* Plaintiff proposed a hunting policy including the compatible human use justification requirement, but Bell told her they did not need the justification and disregarded Plaintiff's explanation. *Id.* Plaintiff believed that Bell saw Plaintiff as a nuisance and did not want to disrupt his "good old boy" relationship with Sweeney. *Id.*

Plaintiff also observed that Bell allowed his family and friends to surf and camp on the preserve's beaches in violation of TNC's procedures. *Id.* ¶ 18. However, Bell became angry when Plaintiff allowed TNC's female Director of Finance to hold a retreat on the Preserve. *Id.* ¶ 19. Bell was upset that Plaintiff had not consulted him before allowing the retreat, and he said that he did not want the Director of Finance on the property and "in his business." *Id.* Bell also did not allow contractors who worked with Laura Riege, the female Restoration Manager of the Preserve, to surf or camp on the property. *Id.* ¶ 20.

As Preserve Property Manager, Plaintiff was tasked with developing and implementing rules for the Preserve upon acquisition of the property. *Id.* ¶ 21. She prepared rules based on other California preserve rules, precluding the improper use of the preserve by Bell's friends and family. *Id.* However, Bell appeared resistant to Plaintiff's new Preserve rules. *Id.* On October 15, 2018, Plaintiff, Bell, Inlander, and McFadden had a phone meeting to discuss implementation of the rules. *Id.* ¶ 22. Plaintiff had previously discussed with Inlander her discomfort with Bell's use of the Preserve. *Id.* She also sent an email to McFadden expressing her concerns. *Id.* During the call, Bell was hostile, asking, "[t]his is all about the surfing, isn't it?" *Id.* ¶ 23. He made clear that he was upset that his private recreational usage was being challenged. *Id.* After the call, Bell continued to allow access to his friends and family. *Id.*

One of Plaintiff's priority projects was to oversee infrastructure improvements on the property. *Id.* ¶ 24. However, she learned that Bell, who had no prior land ownership or management experience, was circumventing TNC rules regarding infrastructure improvements. *Id.* ¶ 25. For example, Bell ignored TNC's standard operating procedures requiring multiple bids on certain contracts and repeatedly hired his male friends for architecture, structural engineering, and construction contracts. *Id.* Bell awarded one of his friends over $300,000 in architectural

2

contracts, justified only by sole source documentation signed by Bell. *Id.* Before Plaintiff's arrival, Bell had authorized major structural improvements to buildings on the Preserve without obtaining any of the required planning permits or building permits, and work had begun with Bell's friend as the contractor. *Id.* ¶ 26.

Plaintiff learned that the California Coastal Commission and Santa Barbara County had significant oversight responsibility over infrastructure projects that TNC pursued on the preserve. *Id.* ¶ 27. Plaintiff, along with outside consultants, determined what types of permits were required for the planned infrastructure projects. *Id.* They were repeatedly told by county officials that TNC needed to obtain Coastal Commission development permits from the County Planning Department for much of the infrastructure work TNC intended to undertake. *Id.* Plaintiff continued to advocate to Bell for acquiring permits for infrastructure improvements on the Preserve. *Id.* ¶ 28. Plaintiff advised Bell that if the public would be invited onto the Preserve, the structures would need to comply with commercial building requirements, such as ADA accessibility. *Id.* Bell continually sought to circumvent the need for Coastal Development permits and ignored Plaintiff's advice concerning ADA compliance. *Id.* Bell also expressed anger toward the female outside consultant when she made recommendations and attempted to replace her with two male consultants. *Id.* ¶ 29.

In Fall 2018, when it was time to discuss moving forward on the next set of infrastructure improvements on the Preserve, Plaintiff proposed a timeline that included time for obtaining the appropriate permits. *Id.* ¶ 30. When Plaintiff, Bell, Inlander, and McFadden had a phone call to discuss the infrastructure improvements, Bell stated that he wanted to skip permitting to save time. *Id.* Inlander and McFadden agreed, despite knowing that Plaintiff was not comfortable with this. *Id.* After the group phone call, Plaintiff had a phone call with McFadden expressing her discomfort with the decision. *Id.* ¶ 31. She sent McFadden multiple follow-up emails documenting her opposition to proceeding without obtaining the necessary permits. *Id.* McFadden eventually stated in an email to Plaintiff that he advocated for obtaining the permits. *Id.*

Next, Bell initiated a meeting with the head of the Santa Barbara County Building Department and TNC representatives regarding the permitting requirements. *Id.* ¶ 32. At that meeting, on February 11, 2019, county officials reiterated to Plaintiff and Bell that TNC needed to work with the planning department to obtain Coastal Commission permits for much of the infrastructure work that TNC intended to undertake on the preserve. *Id.* The county officials

encouraged TNC to submit a comprehensive coastal development permit for the planned infrastructure improvements. *Id.* Bell was upset with the outcome of the meeting, and after Plaintiff insisted that TNC needed to obtain the planning permits, Bell demanded: "Do not go against me on this permitting issue!" *Id.* ¶ 33. Bell also told Plaintiff that it was "all [her] fault" that the County was requiring permits. *Id.*

In February 2019, shortly after these permitting discussions, Bell reorganized the Preserve team structure, increasing his control over Plaintiff. *Id.* ¶ 34. Bell removed McFadden's and Inlander's roles in the property and required everyone on the Preserve team, including Plaintiff, to report directly to him. *Id.* This reduced Plaintiff's ability to make decisions. *Id.* Plaintiff no longer had any direct reports, and approval for Plaintiff to hire a full-time visitation position was rescinded without meaningful explanation. *Id.* Plaintiff continued to receive direction from Bell to develop contracts for a variety of building improvements without obtaining the permits. *Id.* ¶ 35. Plaintiff's proposed timelines always included time to obtain permits, but Bell would frequently advocate for skipping the permitting process during meetings. *Id.*

Bell continued to second-guess and/or ignore Plaintiff's recommendations and decisions. *Id.* ¶ 36. Plaintiff reached out to local contractors and invited them to bid on new projects, in an effort to hire contractors outside of Bell's circle of friends. *Id.* Plaintiff found a new general contractor company, but Bell told her he did not want to use them. *Id.* Eventually, Bell agreed to work with the contractor, but only after doing his own research on the company and having lunch with the male owners of the company without Plaintiff. *Id.* Plaintiff's ability to find a contractor had never been questioned in this manner when she was a project manager in Colorado. *Id.*

In late April 2019, Bell told Plaintiff that he was planning to hire an Assistant Preserve Manager to take on a lot of his duties so that he could focus on fundraising. *Id.* ¶ 37. Bell told Plaintiff that he had three people in mind for the job. *Id.* Plaintiff asked whether Bell thought she would be a good fit for the job, but he told her no because she did not have the right skill set. *Id.* On May 8, 2019, Bell informed Plaintiff that her position was being eliminated due to another reorganization. *Id.* ¶ 38. She was told that she could apply for the new Assistant Preserve Manager position, despite Bell's previous statement that he did not think she would be a good fit for the job. *Id.* Almost immediately after notifying Plaintiff of her termination, TNC posted an advertisement for a position almost identical to Plaintiff's job description. *Id.* ¶ 39. Plaintiff believes that a man was hired for the position. *Id.*

Within the time provided by law, Plaintiff filed a complaint with the California Department of Fair Employment and Housing; she received a right-to-sue letter. *Id.* ¶ 42. Plaintiff has given notice to Defendant and to the California Labor and Workforce Development Agency of Defendants' alleged violations of California Labor Code, including retaliation for opposing and/or raising protected complaints about illegal activity. *Id.*

Plaintiff brought suit in the County of Barbara Superior Court, and Defendants removed to this Court. *See* Notice of Removal, Docket No. 1. Plaintiff filed a motion to Remand. *See* Motion to Remand ("Motion"), Docket No. 11. Defendants oppose. *See* Opposition to Motion to Remand ("Opp'n"), Docket No. 14. Plaintiff replies. *See* Reply in Support of Motion to Remand ("Reply"), Docket No. 21.

## II.     Legal Standard

Federal courts possess limited jurisdiction, having subject matter jurisdiction only over matters authorized by the Constitution and Congressional statute. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Federal courts operate under the presumption that they do not have jurisdiction over state causes of action, and the party claiming federal jurisdiction must prove otherwise. *See id.* (citing *Turner v. Bank of N. Am.*, 4 U.S. 8, 11 (1799); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)). Additionally, "[t]he defendant bears the burden of establishing that removal is proper" and removal statutes are "strictly construed against removal jurisdiction." *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009); *see also Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992) ("[J]urisdiction must be rejected if there is any doubt as to the right of removal.").

Subject-matter jurisdiction exists over claims that: (1) are between citizens of different states, and (2) have an amount in controversy greater than $75,000. *See* 28 U.S.C. § 1332(a). Further, an action that is otherwise removable on the basis of diversity jurisdiction "may not be removed if any of the . . . defendants [are] citizen[s] of the State in which such action is brought." 28 U.S.C.S. § 1441(b)(2). Although diversity jurisdiction requires complete diversity of citizenship, there is an exception to the complete diversity requirement "where a non-diverse defendant has been fraudulently joined." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1043 (9th Cir. 2009).

"Joinder is fraudulent 'if the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.'" *Id.* (quoting

5

*Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007)). Conversely, "if there is any possibility that the state law might impose liability on a resident defendant under the circumstances alleged in the complaint, the federal court cannot find that joinder of the resident defendant was fraudulent, and remand is necessary." *Id*. at 1044. "The burden of proving a fraudulent joinder is a heavy one. The removing party must prove that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the in-state defendant in state court . . . ." *Green v. Amerada Hess Corp.*, 707 F.2d 201, 205 (5th Cir. 1983); *see also Esperanza v. Shanklin Corp.*, No. 5:17–cv–2456–CAS–KK, 2017 WL 6520465, at *2 (C.D. Cal. Dec. 19, 2017); *GranCare, LLC v. Thrower,* 889 F.3d 543, 548 (9th Cir. 2018) ("A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a 'heavy burden' since there is a 'general presumption against [finding] fraudulent joinder.'" (alteration in original)). "[T]he relevant inquiry is only whether plaintiff could state a claim against [the in-state defendant] on any legal theory." *Lytle v. Ford Motor Co*., No. 2:18-cv-1628-WBC (EFBx), 2018 WL 4793800, at *5 (E.D. Cal. Oct. 2, 2018). In other words, "a defendant must essentially show that the plaintiff cannot assert a claim against the non-diverse party as a matter of law." *Amarant v. Home Depot U.S.A., Inc.*, No. 1:13-CV-00245-LJO-SK, 2013 WL 3146809, at *4 (E.D. Cal. June 18, 2013) (citation omitted). "Remand must be granted unless the defendant shows that the plaintiff would not be afforded leave to amend his complaint to cure the purported deficiency." *Nasrawi v. Buck Consultants, LLC*, 776 F. Supp. 2d 1166, 1170 (E.D. Cal. 2011) (alterations and internal quotation marks omitted). If there is a possibility that the plaintiff may be able to amend his pleading to state a claim against the allegedly sham defendant, then remand is warranted. *See Padilla v. AT & T Corp.*, 697 F. Supp. 2d 1156, 1159 (C.D. Cal. 2009).

**III.    Discussion**

TNC does not dispute that TNC CA is a citizen of California. *See generally* Notice of Removal. Rather, TNC argues that it was Plaintiff's sole employer, and TNC CA's citizenship should be ignored because it was fraudulently joined. *See id.* ¶¶ 11-18. In order for this Court to find that TNC CA is a sham defendant, TNC must establish that Plaintiff does not have any possible viable cause of action against TNC CA.[1]

---

[1] As explained in the OSC issued by this Court, Plaintiff's citizenship at the time the action was filed has not been adequately established. However, the question at this stage is likely the same regardless of Plaintiff's citizenship: if Plaintiff was a citizen of California when the action was filed, then complete diversity does not exist unless TNC CA is a sham defendant. And if Plaintiff was a citizen of Colorado when the action was filed, *see* Declaration of Alicia

6

Plaintiff asserts four claims against Defendants: (1) retaliation, in violation of Cal. Labor Code § 1102.5; (2) sex discrimination, in violation of Cal. Gov. Code § 12940; (3) failure to prevent discrimination; and (4) wrongful termination in violation of public policy. *See generally* Complaint, Docket No. 1-1. Because these claims require an employment relationship, Plaintiff is proceeding under a joint employment theory. *See* Motion at 4. Joint employment may exist "where an employer send an employee to do work for another person, and both have the right to exercise certain powers of control over the employee." *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 174 (1979). In determining whether joint employment exists, California courts "consider the 'totality of circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." *Vernon v. State of Cal.*, 116 Cal. App. 4th 114, 124 (2004) (quoting *Lambertsen v. Utah Dep't of Corr.*, 79 F.3d 1024, 1028 (10th Cir. 1996)).

The burden to demonstrate that a party is a sham defendant is very high. For example, in *Gebran v. Wells Fargo Bank, N.A.*, No. CV:1607616 BRO (MRWX), 2016 WL 7471292, at *2 (C.D. Cal. Dec. 28, 2016), Wells Fargo Bank ("WFB") argued that the plaintiff had erroneously sued the wrong defendant, WFB's parent company Wells Fargo & Company ("WFC"), and that WFC was a sham defendant. The district court found that WFB had failed to establish fraudulent joinder, even though the district court cited no evidence showing that WFC exercised day-to-day control over the plaintiff's employment. *Id.* at *6-*9. The court found that the fact that the plaintiff had exhausted her administrative remedies with respect to WFC "support[ed] her position that she may state a claim against WFC." *Id.* at *8. Further, the court explained that even assuming the plaintiff had failed to allege joint employment, "WFB ha[d] not met its burden of establishing that Plaintiff [wa]s incapable of amending her Complaint to state a valid claim against WFC on a joint-employer theory." *Id.* This was in part because "even assuming the terms and conditions of Plaintiff's employment were contractually controlled by WFB, this does not mean that it [wa]s impossible for WFC to exercise control over Plaintiff's employment at WFB's *in practice*." *Id.* at *9 (emphasis in original). Other courts have reached similar conclusions. *See Fraser v. Wells Fargo Bank, N.A.*, No. 15-CV-00772-JD, 2015 WL 1938448, at *1 (N.D. Cal. 2015) (rejecting

---

Anderson, Docket No. 16, ¶ 3, then the local defendant rule under 28 U.S.C. § 1441(b)(2) prevents removal to this Court unless TNC CA is a sham defendant. Either way, the Court must determine whether TNC CA is a sham defendant in order to establish jurisdiction.

sham defendant argument based on the possibility of joint employment and noting that "there are several theories under which a corporate entity separate from the corporate entity that officially employs the plaintiff may be deemed the plaintiff's employer as well" (quoting *Blazek v. Adesa California, LLC*, No. 09 CV:1509BTM(BLM), 2009 WL 2905972, at *2 (S.D. Cal. Sept. 8, 2009))); Cohen v. Valeant Pharm. N. Am., LLC, No. 18CV1540-CAB-BGS, 2018 WL 3409212, at *2 (S.D. Cal. July 13, 2018) ("Here, while Defendants have provided evidence that Plaintiff was technically employed by the parent company (VPNA) and not the subsidiary (SPI), they have not shown by clear and convincing evidence that Plaintiff would be unable to hold SPI liable as a joint employer as a matter of law. . . .").

Here, TNC argues that Plaintiff cannot possibly allege an employment relationship with TNC CA, because TNC CA "is an entirely distinct entity from TNC." Opp'n at 3. In support of removal, the removing defendant may submit facts showing that a resident defendant had "no real connection with the controversy." *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318-19 (9th Cir. 1998) (quoting *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)). According to TNC, TNC CA was established solely to apply for and receive grant funds under California Propositions 40 and 50, and TNC CA has never had any employees. *See* Declaration of Sharon Wasserman in Support of Notice of Removal ("Wasserman NOR Decl."), Docket No. 3, ¶ 4; Declaration of Michael McFadden ("McFadden Decl."), Docket No. 18, ¶ 7. The Board Minutes of TNC CA's November 21, 2006 meeting state that TNC CA is "a pass-through entity" for Proposition 40 and 50 grant funds. Ex. A, Wasserman NOR Decl., Docket No. 3-1, ¶ 2. Further, TNC points out that TNC CA has had no employees or grants earned since 2010, significantly before Plaintiff's employment with TNC. *See* Declaration of Sharon Wasserman in Support of Opposition to Motion to Remand ("Wasserman Opp'n Decl."), Docket No. 15, ¶ 7. TNC points to the minutes of TNC CA's November 2018 board meeting, which state that TNC CA "has not received Prop 40 or 50 grant funds nor made property acquisitions with such funds since 2010." Ex. B, Wasserman Opp'n Decl., Docket No. 15-2, ¶ 4.

Plaintiff disputes TNC's assertions that no employment relationship could possibly exist between Plaintiff and TNC CA. First, Plaintiff also points to the 2006 TNC CA Board Meeting Minutes, which states:

> [TNC CA] intends to enter into a resource sharing agreement to manage the day-to-day operations of [TNC CA], pursuant to which [TNC CA] will use TNC employees and other resources to prepare grant applications, apply for[,] and accept

> available funding. . . . If funds are awarded for specific projects, [TNC CA] will enter into a grant agreement with the granting agency with the intention of subcontracting with TNC to perform the terms of the grant[ and] oversee any projects for which funds are received.

Ex. A, Wasserman NOR Decl., ¶ 2. Plaintiff argues that these terms demonstrate an intention for TNC and TNC CA to jointly exercise control over an employee applying for and accepting funding under Propositions 40 and 50. Herrington's job description while working at the Preserve included "ensuring that public and private funds [were] raised to meet programmatic needs," and "[d]emonstrated experience in fundraising or grant writing" was a preferred qualification for the job. Declaration of Jennifer Herrington ("Herrington Decl."), Docket No. 11-2, ¶ 2; Ex. A, Herrington Decl., at 5.

The Court would find that TNC has not demonstrated that Plaintiff could not possibly state a cause of action against TNC CA. The Court agrees that the 2006 TNC CA Board Meeting Minutes suggest that TNC CA could have jointly exercised control with TNC over the process of applying for and administering grants under Propositions 40 and 50. Plaintiff states that she helped seek grant funding while she worked at the Preserve. *See* Herrington Decl. ¶ 2. TNC submits declarations from McFadden and Inlander, with whom Plaintiff worked at the Preserve, to the effect that McFadden and Inlander had not directed Plaintiff to work on projects for TNC CA and were not aware that she had done so. *See* McFadden Decl., ¶¶ 7-8; Declaration of Ethan Inlander ("Inlander Decl."), Docket No. 17, ¶¶ 8-9. However, as Plaintiff points out, McFadden and Inlander ceased to supervise her after the February 2019 reorganization at the Preserve, after which Bell became Plaintiff's direct supervisor. *See* Complaint ¶ 34. Similarly, the 2018 TNC CA Meeting Minutes explaining that TNC CA had not received any grants since 2010 do not prove that Plaintiff did not work on relevant grant applications − both because Plaintiff's employment began in 2019, after the meeting, and because the fact that TNC CA did not receive grants does not prove that they did not apply for them. Therefore, it is possible that Plaintiff could amend her complaint to allege that she worked with Bell on grant applications that were overseen by TNC CA.[2] And as in *Gebran*, Plaintiff asserts that she has exhausted her administrative remedies and

---

[2] It is immaterial that Plaintiff has not actually offered to amend her Complaint to put forward such evidence, because "the test[s] for fraudulent joinder and for failure to state a claim under Rule 12(b)(6) are not equivalent." *Grancare*, 889 F.3d at 549. "Because the purpose of the fraudulent joinder doctrine is to allow a determination whether the district court has subject matter jurisdiction, the standard is similar to the 'wholly insubstantial and frivolous' standard for dismissing claims under Rule 12(b)(1) for lack of federal question jurisdiction." *Id*. The question is whether there

received a right to sue letter against both TNC and TNC CA from the Department of Fair Employment and Housing. *See* Complaint, ¶¶ 42-43; Ex. A to Complaint, Docket No. 1-1. In sum, while TNC asserts various factual defenses as to why it does not believe Plaintiff can recover against TNC CA, these substantive defenses fail to demonstrate fraudulent joinder. *See Gebran*, 2016 WL 7471292, at \*5. At this stage, the Court cannot say as a matter of law that Plaintiff could not possibly assert a claim against TNC CA. Because the Court would not find that TNC CA is a sham defendant, the Court concludes that it lacks jurisdiction, either for lack of complete diversity and/or because TNC CA is a local defendant.

## IV. Conclusion

Based on the foregoing discussion, the Court would **GRANT** the Motion to Remand.

---

is absolutely no possibility that the Plaintiff will be able to establish a cause of action against TNC CA.